The **TOILET GOODS ASSOCIATION,**
Inc., et al., Plaintiffs,

v.

John W. **GARDNER,** Secretary of Health,
Education and Welfare, and James L.
Goddard, Commissioner of Food and
Drugs, Defendants.

No. 63 Civ. 3349.

United States District Court
S. D. New York.

Jan. 8, 1968.

**787**

that three of the FDA Regulations challenged by plaintiffs are ripe for judicial review,[1] a pre-trial conference was held. At that conference, the parties, with the approval of this court, agreed that summary judgment based upon the pleadings, affidavits and depositions taken by plaintiffs of certain government witnesses was appropriate for resolution of the merits of plaintiffs' attack upon the Regulations in question. Final briefs were submitted and arguments were heard on the summary judgment motions on November 6, 1967. For reasons to be summarized hereinafter, this court sustains plaintiffs' challenge to the three pertinent administrative regulations.

Breed, Abbott & Morgan, New York City, by Edward J. Ross, and Stephen R. Lang, New York City, for plaintiffs.

Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, by Arthur S. Olick, Asst. U. S. Atty., for defendants, and William Goodrich, Asst. Gen. Counsel, Food and Drug Administration, for defendants.

### OPINION

TYLER, District Judge.

The merits of this controversy are now before this court upon the renewed motion of plaintiffs and cross-motion of defendants (hereinafter collectively referred to as "FDA") for summary judgment. For the history of this interesting litigation, see Toilet Goods Association, Inc. v. Celebrezze, 235 F.Supp. 648 (S.D.N.Y.1964); modified sub nom. Toilet Goods Association, Inc. v. Gardner, 360 F.2d 677 (2d Cir. 1966), aff'd, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 and 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967).

On June 9, 1967, after the aforementioned opinions of the Supreme Court were handed down, sustaining the view of this court and the Court of Appeals

### I.

On July 12, 1960, Congress engrafted upon the Food, Drug and Cosmetic Act, 52 Stat. 1040 (1938), as amended, 21 U.S.C. §§ 301–392 (1964), ("the Act"), certain new provisions known as the Color Additive Amendments, 74 Stat. 397 (1960) (codified in scattered sections of 21 U.S.C.), ("the 1960 Amendments"). After rule-making procedures in conformity with Section 4 of the Administrative Procedure Act, 5 U.S.C.A. § 553 (1967), the Commissioner of FDA issued Color Additive Regulations ("the Regulations"), 21 C.F.R. §§ 8.1 et seq. (1967), to take effect, with certain exceptions, in June, 1963. This suit was then commenced. After preliminary litigation of important questions of jurisdiction and scope of judicial review, there now remain issues as to the validity of three segments of the Regulations attacked in the first three stated claims in plaintiffs' complaint. These three claims may be briefly summarized as follows:

1. The 1960 Amendments require premarketing clearance by FDA of every color additive for commercial use and, as well, certification of each "batch" unless specifically exempted by regula-

---

1. This court originally held that a fourth FDA Regulation was ripe for judicial review; as to this, the Court of Appeals reversed, which reversal was sustained by the Supreme Court.

tion. The Amendments also define a color additive as a material which—

"(A) is a dye, pigment, or other substance made by a process of synthesis * * * or otherwise derived * * * from a vegetable, animal, mineral, or other source, and (B) when added or applied to a food, drug, or cosmetic, or to the human body or any part thereof, is capable (alone or through reaction with other substance) of imparting color thereto * * *." 74 Stat. 397 (1960), 21 U.S.C. § 321(t) (1) (1964).

In its Regulations, FDA amplified the statutory definition of color additive to include any

"substance that, when applied to the human body results in coloring * * unless the function of coloring is purely incidental to its intended use, such as in the case of deodorants. Lipstick, rouge, eye makeup colors, and related cosmetics intended for coloring the human body are 'color additives' ". 21 C.F.R. § 8.1(f) (1967).

Plaintiffs claim that in promulgating this Regulation definition so as to include many finished cosmetics, FDA expanded the 1960 Amendments' reach beyond limits intended by Congress.

2. In the same definitional section, FDA construed the statutory term "color additive" to include all diluents, elsewhere defined as: "any component of a color additive mixture that is not of itself a color additive and has been intentionally mixed therein to facilitate the use of the mixture in coloring foods, drugs, or cosmetics or in coloring the human body". 21 C.F.R. § 8.1(m) (1967). It is contended by plaintiffs that in so defining diluents and including them in Regulation § 8.1(f), FDA has expanded the number and category of items which must receive premarketing clearance beyond what Congress provided in the Act as amended.

3. Plaintiffs finally challenge a Regulation of FDA which concerns the so-called "exemption for hair dyes" appearing in Section 601(a) and (e) of the Act, 52 Stat. 1054 (1938), as amended, 21 U.S.C. § 361(a) and (e) (1964).

Subsection (a) was first enacted in 1938 and was not changed by the 1960 Amendments. It provides that, notwithstanding the fact that they may be injurious if used as directed, hair dyes containing coal-tar colors cannot be deemed adulterated on account of any deleterious contents, so long as their labels display a certain cautionary notice prescribing a "patch test". This simple test is utilized by the purchaser to ascertain whether or not the particular dye in question will cause his or her skin to be irritated by application of the dye. Subsection (e) was also part of the 1938 Act. It originally provided that all cosmetics except hair dyes were deemed adulterated if they contained coal-tar colors and did not comply with the Act's certification, listing and pretesting provisions. See Section 601(e) of the Act, 52 Stat. 1054 (1938). This subsection was amended in 1960 to extend the concept of adulteration to the use of any color additive without the new certification procedures, but the general exemption for hair dyes was left unchanged. FDA's new Regulation acknowledges the continuing validity of a hair dye exemption, but, adds the following language:

"If the poisonous or deleterious substance in the 'hair dye' is one to which the caution is inapplicable and for which patch-testing provides no safeguard, the exemption does not apply; nor does the exemption extend to poisonous or deleterious diluents that may be introduced as wetting agents, hair conditioners, emulsifiers, or other components in a color shampoo, rinse, tint, or similar dual-purpose cosmetics that alter the color of the hair". 21 C.F.R. § 8.1(u) (1967).

In plaintiffs' view, the quoted language of this Regulation cannot be reconciled with the statute. Specifically, they argue that: (1) whereas Section 601(a) plainly exempts all hair dyes complying with the patch-test requirement, FDA's language purports to limit the exemption to only those dyes for which the patch-test is an effective safeguard; (2) by virtue of the interaction of Regulation

§ 8.1(u) with Regulation § 8.1(f) and (m), FDA, without Congressional authority, is subjected to premarketing clearance all components of a hair dye except, perhaps, those coloring ingredients for which the patch test is meaningful and effective.

## II.

■ As a starting point, the Regulations here attacked must be deemed valid in the absence of a substantial showing that they are plainly inconsistent with the statute they seek to interpret. See United States v. Obermeier, 186 F.2d 243, 247 (2d Cir. 1950), cert. denied, 340 U.S. 951, 71 S.Ct. 569, 95 L.Ed. 685 (1951). Consequently, plaintiffs recognize that they have the burden of showing that the Regulations exceed the authority granted to FDA by the 1960 Amendments.

FDA's principle position is that the Regulations are reasonable in that they are in accordance with the language of the Amendments and carry out their clear purposes. In order to appraise the conflicting positions of the parties, it will be helpful to summarize briefly the background and purposes of the 1960 Amendments.

Prior to 1938, drug and cosmetic colors were not subject to any specific statutory regulation in this country. The original Food and Drug Act of 1906, 34 Stat. 768, did not deal specifically with the problem of colors added to food or drugs; instead, they were dealt with under the statutory provisions relating to adulterated foods. Food and Drug Act of 1906, § 7, 34 Stat. 770. The latter provisions effectively placed the burden of establishing harmfulness of a food upon the government. Nevertheless, informal regulation of potentially harmful coal-tar colors was instituted. A list of colors deemed harmless was drawn up and color manufacturers submitted samples of their products to the Department of Agriculture for certification. In 1938, Congress formalized this regulation as part of the Food, Drug and Cosmetic Act, and provided penalties for non-compliance with the revised certification procedures. 52 Stat. 1043 (1938), as amended, 21 U.S.C. § 333 (1964).

■ The Act clearly encompassed the regulation of color ingredients in foods, drugs and cosmetics; it placed emphasis upon the harmlessness of certain coal-tar color ingredients. Its provisions relieved the FDA of the burden of proving the dangerousness of the colors or the final products; the burden of demonstrating harmlessness of a particular color was placed upon the manufacturer. See Flemming v. Florida Citrus Exchange, 358 U.S. 153, 162, 79 S.Ct. 160, 3 L.Ed.2d 188 (1958); Certified Color Industry Committee v. Secretary of Health, Education and Welfare, 236 F.2d 866 (2d Cir. 1956); Section 406(b) of the Act, 52 Stat. 1049 (1938).

In 1958, the Supreme Court was presented with a case involving construction of the principal of harmlessness of color ingredients. Flemming v. Florida Citrus Exchange, supra. In effect, the Court concluded that if a color ingredient proved to be toxic in any concentration, it should not be listed or certified by FDA. Further, such a color, if not certified, could not be used at all, even in lower concentrations which could be proven non-toxic. In sum, the Supreme Court in *Flemming* enunciated approval of the so-called "harmless per se" principle theretofore pressed by FDA. As a consequence, it appeared that practically all coal-tar colors would have to be de-listed, thereby threatening removal from the American market of food, drug and cosmetic articles which contained coal-tar colors, but which had theretofore received wide consumer acceptance.

There then arose industry pressure upon Congress and FDA for remedial legislation. For understandable reasons, industry representatives pressed vigorously for legislation to sanction the so-called "safe for use" principle which, in their view, would prevent needless withdrawal of previously marketed products, by permitting the use of color ingredients within certain prescribed tolerances. A preliminary draft of such legislation

was submitted to the industry by FDA in April, 1959. After many interchanges of views by FDA, the industry and Congressional representatives, a final bill containing significant changes successfully pressed for by the industry became law in July, 1960. Thereafter, FDA promulgated its Regulations which were published in the Federal Register on June 22, 1963.

### III.

Turning specifically to the first claim of plaintiffs that the Regulation definition of a color additive exceeds the statutory authority, it might be simple and expeditious to begin by examining the plain meaning of the language of both the statute and, to an extent, the Regulation itself. FDA argues that the term "color additive" was meant by Congress to embrace, *inter alia,* finished cosmetic products. I am constrained to reject this argument upon the ground that "additive" obviously means something to be added. Webster's Third Edition, for example, defines additive as "a substance added to another in relatively small amounts to impart or improve desirable properties * * * [such as] a substance added to a foodstuff to improve color * * *." Webster, Third New International Dictionary 24 (1961). It seems reasonable to infer that this commonsense dictionary definition was carried into the statutory definition by Congress when it defined a color additive as "a material which * * * when *added* * * * to a food, drug, or cosmetic" imparts color thereto. 74 Stat. 397 (1960), 21 U.S.C. § 321(t) (1) (1964). (Emphasis added.)

FDA's main argument supporting its interpretation of the statute relies on that portion of the definition of color additive which includes the language: "other substance * * * [that] when * * * applied to * * * the human body * * * is capable * * * of imparting color thereto * * *." One sentence embedded in Regulation § 8.1 (f) incorporates much of this language in *haec verba.* As will be discussed hereinafter, I conclude that this language does not support FDA's view that finished cosmetics are color additives. First, Congress in the basic statute has used the word "cosmetics" frequently when it so intended to mean cosmetics. See, e. g., 52 Stat. 1042 (1938), as amended, 21 U.S.C. § 331 (1964) (prohibited acts); 52 Stat. 1057 (1938), as amended, 21 U.S.C. § 374 (1964) (factory inspection); 52 Stat. 1058, as amended, 21 U.S.C. § 381 (1964) (imports and exports). Thus, it seems somewhat strained to suggest at this late date that the word "substance" should be taken to mean, among other things, "cosmetics". Second, the familiar doctrine of *ejusdem generis* would be offended if I accepted FDA's position. As set forth above, the statute defines color additive as "a dye, pigment, or other substance * * *." Dyes and pigments are two kinds of color ingredients that not only impart color, but also contain their own color. There are, however, some color ingredients which themselves are colorless. For example, dihydroxy acetone in the cosmetic "Man Tan" imparts a yellow-brown hue to a person's skin, although it is colorless. This is undoubtedly an example of what Congress meant when it used the term "substance". Enlargement of that word to include finished cosmetics would seem abnormal and uncalled for. See Cleveland v. United States, 329 U.S. 14, 18, 67 S.Ct. 13, 91 L.Ed. 12 (1946).

Third, accepting FDA's position that the term "substance" includes many finished cosmetics, then to follow the statutory definition, "color additive" could be construed as a cosmetic "added or applied to a * * * cosmetic". I cannot assume that such an absurd result can be lightly imputed to a Congressional enactment.[2]

---

2. A number of FDA's Regulations, promulgated on the same day as those under attack in this case indicate that FDA has also interpreted the term "color additive", in certain contexts, to mean only a component of a food, drug or cosmetic.

Fourth, viewing the Act as a whole, it is significant that Congress has consistently defined the finished products at which the statute is aimed—i. e., food, drugs and cosmetics—as "articles". See 52 Stat. 1041 (1938), as amended, 21 U.S.C. § 321 (1964). Conversely, the word "substance" seems to have been used consistently to connote a component or an ingredient of a finished article. See, e. g., 74 Stat. 397 (1960), 21 U.S.C. § 321(s) (1964); 52 Stat. 1049 (1938), as amended, 21 U.S.C. § 346 (1964). In other words, I find it significant that Congress used the word "substance" rather than the word "article" in its definition of color additive.

■ As heretofore indicated, FDA finds support for Regulation § 8.1(f) in a few select words culled from the broader statutory definition of color additive. But, as plaintiffs submit, almost identical language can be extracted from the coal-tar color definition found in earlier FDA regulations. See 21 C.F.R. § 135.1 (1949). Not even FDA has ever maintained that this earlier definition embraced finished cosmetic products. Congress, therefore, must be presumed to have known of this administrative construction and to have approved it in 1960. See Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 115, 59 S.Ct. 423, 83 L.Ed. 536 (1939).

■ In the light of these problems inherent in FDA's position, not to mention others cited by plaintiffs in their briefs, I am constrained to find that Regulation § 8.1(f) far exceeds the statutory definition of Congress. In fairness to FDA, I have looked to the legislative history and even to the views of the principal administrative architects of the proposals to Congress which led to the 1960 Amendments, in order to ascertain whether what I consider to be a natural reading and understanding of the plain language is something else again—i. e., something technical, abstruse and am-

biguous. I find, however, that: (1) the legislative history of the 1960 Amendments fortifies the impression that their language imparts; and (2) FDA officials did not originally interpret the 1960 Amendments as authorizing premarketing clearance of finished cosmetics; indeed, FDA after 1960 sought such precise authority from Congress. See, e. g., H.R. 11582, 87th Cong., 2d Sess. (1962); H.R. 1235, 88th Cong., 1st Sess. (1963).

IV.

■ Count 2 of plaintiffs' complaint, as previously noted, challenges FDA's definition of the term "diluent" in Regulation § 8.1(m) and its inclusion of that term in its definition of "color additives". See 21 C.F.R. § 8.1(f) (1967).

Here FDA again urges that these Regulations are in accord with the letter and purpose of the 1960 Amendments. Specifically, though it has been stated several ways, FDA's basic argument is that if a particular cosmetic component functions to make a coloring agent effective, then that component is a color additive—i. e., that component must also undergo premarketing clearance and listing procedures.

Immediate difficulties attend FDA's position. Indeed, it can be perceived that if one takes the view that the definition of "color additive" in 21 U.S.C. § 321(t) includes only dyes, pigments and other coloring components, the inevitable consequence is that FDA's regulatory scheme requiring premarketing clearance of non-coloring components must fall.

A more detailed analysis supports this view. To begin with, FDA's position raises problems of the plain meaning of the terminology used in the 1960 Amendments and in the Act as a whole. The primary reference to diluents appears in Section 706(c) of the Act, 52 Stat. 1058 (1938), as amended, 21 U.S.C. § 376(c), where Congress authorizes FDA to provide by regulation "for the

The Regulations speak of a color additive "used in food, drugs, or cosmetics", 21 C.F.R. § 8.29(h) (1967), and "food, drug, or cosmetic [shipments] containing" color additives. 21 C.F.R. § 8.33(a) (1967).

certification, with safe diluents or without diluents" of batches of color additives listed for use in or on food, drugs or cosmetics. "Diluent" is normally understood to mean "a thing that dilutes or dissolves another thing", Webster, New World Dictionary 411 (College Ed. 1955) or "an inert substance used to increase the volume of some other substance or solution", Van Nostrand, Chemists' Dictionary 224 (1953). In the context of colors, then, a diluent is a substance which dilutes a straight color or adds volume to a straight color. Since pure dyes, pigments and like coloring agents are often stronger than required to impart the desired color to finished cosmetics, they are usually diluted to facilitate handling and mixing.

With these definitions in mind, it is somewhat startling to consider FDA's view that the 1960 Amendments gave it authority to list and "pre-clear" all the many non-color ingredients of finished cosmetics. Prior to 1960, FDA clearly had no such power. It could only provide regulations for listing coal-tar colors and "for the certification of batches of such colors, with or without harmless diluents". See, e. g., Section 604 of the Act, 52 Stat. 1055 (1938).

Congress, obviously familiar with diluents, made only one change concerning such substances in 1960; it substituted the word "safe" for the word "harmless". It did not, however, give FDA power to list diluents, only the power to certify them. The only power of listing given in 1960 was to provide "for separately listing color additives * * *." 52 Stat. 1058 (1938), as amended, 21 U.S.C. § 376(b) (1) (1964).

FDA, however, has promulgated Regulation § 8.1(f) and (m) to be read together in a way to achieve listing of diluents and non-color ingredients—something which Congress specifically did not do in the 1960 Amendments. As a matter of plain meaning, FDA's attempt to define color additives to include diluents exceeds the powers conferred upon it by Congress.

Under such circumstances, resort to legislative history would be fruitless and unnecessary under normal rules of statutory interpretation. Interestingly, however, resort to legislative history here again fortifies the view espoused by plaintiffs. The omission of the 1960 Amendments to require listing of non-color ingredients was specifically noted at the Hearings, Hearings on H.R. 7624 Before the House Committee on Interstate and Foreign Commerce, 86th Cong., 2d Sess. 113–14 (1960), and on the floor of the House, 106 Cong.Rec. 14369, 14371 (1960) (remarks of Congresswoman Sullivan).

■ Prior to 1960, FDA's construction of the Act clearly reflected the fact that the only regulation of diluents was certification in connection with certain coal-tar colors. See 21 C.F.R. §§ 135.1 (d), 135.3, 135.6 (1949). This being so, it must be assumed that when it passed the 1960 Amendments making only a slight change in the language pertaining to diluents, Congress intended to withhold from FDA the power to require pretesting and listing of non-color ingredients, including diluents. Helvering v. R. J. Reynolds Tobacco Co., supra at 115, 59 S.Ct. 423, 83 L.Ed. 536 (1939).

### V.

■ FDA's new Regulations contain two provisions which deal with hair dyes: (1) Regulation § 8.1(f) impliedly includes hair dyes within the scope of the term "color additives"; and (2) Regulation § 8.1(u), by its terms, declares the patch-test warning exemption set up in Section 601(a) of the Act, 52 Stat. 1054, 21 U.S.C. § 361(a) (1964) inapplicable to any hair dyes which may contain toxic ingredients to which the patch test is irrelevant.

Plaintiffs argue principally that these Regulations are an unsanctioned administrative rewriting of Section 601(a) of the Act, relating to adulterated cosmetics, which by its terms plainly exempts from its embrace any coal-tar

hair dyes which display the prescribed patch-test label:

"A cosmetic shall be deemed to be adulterated—(a) If it bears or contains any poisonous or deleterious substance which may render it injurious to users * * * Provided, That this provision shall not apply to coal-tar hair dye * * * (the label of which contains the patch-test warning)."

They further argue that these Regulations wholly ignore Section 601(e) which exempts hair dyes from the general provision deeming all cosmetics containing unlisted color additives as adulterated. 52 Stat. 1054 (1938), as amended, 21 U.S.C. § 361(e) (1964).

FDA in its original brief argued that Congress in the 1960 Amendments somehow conferred upon it the power to require listing and pretesting of all hair dyes to which the patch test is inapplicable. Apparently recognizing that Congress did nothing in 1960 to amend Section 601 except to rewrite subparagraph (e) thereof to substitute "color additive" for "coal-tar color",[3] FDA in its subsequent memoranda and arguments has supported its Regulations by the suggestion that they reflect the spirit of Congressional intentions in 1960 to give broad scope to the "safe for use" principle.

For my part, it would seem that if Congress had intended what FDA now provides in Regulation § 8.1(f) and (u) in respect to hair dyes, it could have easily said so in simple, plain language. A reasonable construction of the seemingly unequivocal language of Section 601(a) is that hair dyes which contain the prescribed patch-test label cannot be found to be adulterated. Justification of this meaning can be found in the fact that FDA itself, until 1963, always so construed the section in question. See Deposition of FDA Deputy Commissioner John L. Harvey, Tr. 88–89, 425–26; cf. 21 C.F.R. § 1.200 (1949). Furthermore, the depositions of FDA officials in

this litigation indicate that for at least 15 years FDA has unsuccessfully sought to obtain a statutory amendment to provide essentially what Regulation § 8.1(f) and (u) now purport to declare. See, e. g., H.R. 6788, 88th Cong., 1st Sess. (1963). In short, it must be assumed that in 1960, Congress, well aware of the exemption and FDA's desire to do away with it, purposefully continued the exemption as it had always been understood. See Helvering v. R. J. Reynolds Tobacco Co., supra.

FDA's reliance upon Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676, 682–83 (9th Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949), to support its argument that such long-standing administrative recognition of the exemption amounts to no more than out-dated pronouncements of mere "historical interest" is misplaced. In *Willapoint*, the statutory changes which rendered the applicable previous administrative construction of only historical interest were major and sweeping; here they plainly are not.

## CONCLUSION

For the foregoing reasons, plaintiffs have established their first three stated claims that the FDA Regulations in question exceed the statutory authority conferred upon FDA by Congress in the 1960 Amendments and thus are entitled to summary judgment. If one common, simplistic thread can be perceived to tie up and resolve all the issues posed in this case, it is that if Congress had intended to confer upon FDA the regulatory powers which that agency has assumed in the Regulations attacked by the cosmetics industry, it could have easily done so in simple and unambiguous language. Congress did not do so, and the obvious implications from that negative are fortified by the legislative history of the 1960 Amendments.

To so conclude is not to suggest any hostility of this court to the concept of enhanced consumer protection in the

3. Although not pertinent here, Congress in 1960 also, it is true, changed Section 601(e) to refer to the new certification procedure in 21 U.S.C. § 376(a).

cosmetic field. Rather, the point of this case is that Congress, and not the FDA or the federal courts, has the power to establish such consumer protection.

Settle an appropriate order and judgment on notice.