**UNITED STATES of America,**
**Plaintiff,**

v.

**BODINE PRODUCE CO., Inc., a corpora-**
**tion, Defendant.**

**No. C–15992.**

United States District Court
D. Arizona.

May 24, 1962.

 

C. A. Muecke, U. S. Atty., Sheldon Green, Asst. U. S. Atty., Phoenix, Ariz., for plaintiff.

Jennings, Strouss, Salmon & Trask, by Ozell Trask, Phoenix, Ariz., for defendant.

BOLDT, District Judge.

At various stages in this proceeding— during the trial, after the jury's verdict of guilty, at the time of sentencing, and in considering defendant's motions subsequent to sentencing—, the Court has carefully evaluated the issues raised by the defendant. These issues merit a more extended presentation of the views of the Court than as previously stated extempore.

The case arose as a misdemeanor criminal action under the Federal Food, Drug, and Cosmetic Act. In the Amended Information filed by the United States Attorney, the defendant was charged with having violated that Act by causing adulterated lettuce to be introduced and delivered for introduction into interstate commerce at Glendale, Arizona, consigned to Milwaukee, Wisconsin. [21 U.S.C.A. § 331(a)].

The lettuce was alleged to be adulterated within the meaning of 21 U.S.C.A. § 342(a) (2) (B) in that it was a raw agricultural commodity and it contained a pesticide chemical, namely DDT, which was unsafe within the meaning of 21 U.S.C.A. § 346a(a) since the quantity of such pesticide chemical on the lettuce was not within the limits of the tolerance for DDT prescribed by regulations of the Secretary of Health, Education, and Welfare.

Pertinent regulations of the Secretary, issued by statutory authority, established a tolerance or permissible limit of 7 parts per million for DDT on lettuce. [21 CFR 120.101(e) (49); 21 U.S.C.A. § 346a(e) and (k); 21 U.S.C.A. § 346; 21 U.S.C.A. § 371(a) and (e)].

Upon the evidence adduced at the trial, the jury obviously concluded that the lettuce shipped by the defendant in this instance contained DDT in excess of 7 parts

per million. In fact there was no substantial evidence to the contrary.

The defense attempted to introduce extraneous issues in the case which, in the opinion of the Court, would have tended to confuse the jury if evidence thereon had been admitted. These issues included (1) at collateral attack on the validity of the regulations, (2) an offer to show lack of danger to health, and (3) an assertion that defendant's shipment of lettuce came within the exemption proviso in 21 U.S.C.A. § 342(a) (2). Evidence bearing on these issues was excluded at the trial for the reasons hereinafter given.

### 1. Collateral Attack On The Regulations

■ Defendant conceded that the Secretary of Health, Education, and Welfare has the authority to establish tolerances for pesticide chemicals on raw agricultural commodities but contended that he exercised his discretion in an arbitrary and capricious manner. It was therefore defendant's intention to question the validity of the regulation and to show that a much greater tolerance should have been established for DDT on lettuce.

This Court is not the proper forum in which to raise such issues or to seek review of the merits of the regulation.

The statute prescribes a procedure to obtain direct judicial review of the merits of such regulations in a *United States Court of Appeals* by filing a petition within 90 days after the regulations are issued. [21 U.S.C.A. § 371(f) (1); see also 21 U.S.C.A. 346a(i) (1)]. The judgment of the Court of Appeals is final subject to review by the United States Supreme Court. [21 U.S.C.A. § 371(f) (4); see also 21 U.S.C.A. § 346a(i) (5)].

The regulations on which this case hinges were issued by the Secretary and were published on March 11, 1955. [20 Federal Register 1473]. No statutory

appeal was taken by the defendant or by anyone else.

Had there been direct judicial review pursuant to the statute and had the validity of the regulations been sustained in that proceeding, there can be no doubt that the merits of the regulations would no longer be open to judicial scrutiny in a subsequent proceeding to enforce the regulations. See City of Tacoma v. The Taxpayers of Tacoma, 1958, 357 U.S. 320, 336–337, 78 S.Ct. 1209, 2 L.Ed.2d 1345.

If direct judicial review is not sought within the 90-day period allowed by the statute, the right to such review is lost and the regulations become final in the same way as they would if affirmatively upheld on direct review.

■ In a collateral action such as this one to enforce a regulation, it is not proper for the defendant to challenge the regulation upon any grounds other than the statutory requirements relating to notice and hearing. Byrd v. United States, 5 Cir., 1946, 154 F.2d 62, 63–64. These requirements are essentially statutory rather than constitutional because there is no fundamental right to a hearing in the rule-making [1] process. Thus in Willapoint Oysters, Inc. v. Ewing, 9 Cir., 1949, 174 F.2d 676, cert. den. 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527, which was a direct appeal from a rule-making regulation under the Federal Food, Drug, and Cosmetic Act, the Court said at page 694 of 174 F.2d:

> " * * * * in legislation, or rule-making, there is no constitutional right to any hearing whatsoever. Thus the requirements of any hearing are to be tested solely by the statute so providing, which may or may not import constitutional concepts."

In any event, the regulation now before the Court was adopted in full compliance with the procedural requirements of notice and hearing as prescribed by the statute. [21 U.S.C.A. § 371(e)]. A

---

[1]. The regulation establishing the tolerance for DDT in lettuce is rule-making since it declares a rule of conduct that applies to all persons who deal with lettuce in interstate commerce.

Notice of Hearing was published in the Federal Register on September 17, 1949. [14 Federal Register 5724]. It stated that a public hearing would be held commencing January 17, 1950, at a designated address, upon proposals to issue regulations limiting the quantity of poisonous or deleterious residues on fresh fruits and fresh vegetables.

Pursuant to this Notice, a lengthy public hearing ("at a cost of nearly a half-million dollars to Government, to industry, to agricultural organizations, and to the various land-grant colleges") was held which required protracted study before regulations could be issued, [Senate Report No. 1635, published in U.S.Code Congressional and Administrative News, 1954, Vol. 2, pages 2626, 2627.]

On October 20, 1954, the Secretary published a Notice of Proposed Rule Making stating proposed findings and proposed tolerances for a number of poisonous and deleterious substances on a number of fresh fruits and vegetables. [19 Federal Register 6738]. With respect to DDT on lettuce, the proposed tolerance was 7 parts per million. [19 Federal Register 6770]. Interested persons were given 60 days to file written exceptions. [19 Federal Register 6772].

On March 11, 1955, a final order [2] was published establishing tolerances for pesticide residues in or on fresh fruits and vegetables. [20 Federal Register 1473]. The tolerance for DDT in or on lettuce is 7 parts per million. [20 Federal Register 1506]. No direct judicial review was sought within the 90-day period permitted by 21 U.S.C.A. § 371 (f) (1).

■ For these reasons, the statutory requirements relating to notice and hearing were fully met. There is no basis for challenging the validity of the regulations on procedural grounds and no other grounds may properly be urged in this Court.

The statute and regulations provide a procedure to amend or repeal the regulations. [21 U.S.C.A. § 346a(a); 21 CFR 120.32; 21 U.S.C.A. § 346a(e); 21 U.S.C.A. § 371(e)]. The Court is not advised, however, of any attempt to amend or repeal the regulations establishing a tolerance of 7 parts per million for DDT on lettuce. If there are sound reasons for changing the regulations, those reasons should be urged before the Secretary in conformity with the procedure prescribed for that very purpose. The Secretary's action (or inaction) will then be subject to direct judicial review under 21 U.S.C.A. § 371(f) (1), 21 U.S.C.A. § 346a(e), (d) (5), and (i) (1).

Defendant relied upon United States v. Lord-Mott Co., D.C.D.Md.1944, 57 F. Supp. 128, as authority for the proposition that regulations such as these may be collaterally attacked in an enforcement action. There the defendant was charged with the interstate shipment of canned peals which, by reason of excessive mealiness, did not conform to a standard of quality established by regulation 4 years earlier. No one had sought direct judicial review of that regulation within 90 days after its issuance, through the procedure authorized by 21 U.S.C.A. § 371 (f). At the trial, the District Court permitted defense witnesses to testify in effect that the regulation did not permit enough mealiness. The Court then concurred in this view and concluded that the regulation was too rigid and was invalid. Speaking of a critical administrative finding of fact in the regulation, the District Court said at page 133 of 57 F.Supp.:

"Whether this finding is actually supported by the weight of the credible testimony at the hearing which led up to the promulgation of the regulation, we do not purport to determine. It is not necessary to do so, because, * * * defendant is not controlled by what was proved or decided by that hearing, but has a right to have this Court decide the question of the regulation's validity

---

**2.** From the record references in this order, it is clear that the record consisted of approximately 7000 pages of testimony and more than 1200 exhibits.

upon the evidence produced before it."

This Court does not agree that defendant is entitled to a *de novo* hearing in a District Court on the merits of such a regulation in an action brought to enforce that regulation. Under the Lord-Mott case, a person need not exhaust his administrative remedies in seeking modification of a regulation nor need he follow the statutory procedure for exhausting his remedy at law by seeking direct judicial review. Whenever an enforcement action is brought against him he could ask the District Court to disregard the regulation and to sit as a super-administrative body to hear voluminous testimony *de novo* as to what is a proper food standard or a proper tolerance for pesticide chemicals on raw agricultural commodities. If there are 20 different enforcement actions against 20 different persons in 20 different district courts based upon 20 alleged violations of the same regulation, in each action there could be an independent *de novo* hearing.

Furthermore, under the Lord-Mott holding, review of a regulation in a district court in a collateral proceeding is far more sweeping in scope than the direct judicial review authorized by statute in a Court of Appeals and in the Supreme Court. The statutory procedure authorizes a Court of Appeals under some circumstances to order additional evidence taken, not in Court, but *before the Secretary*. [21 U.S.C.A. § 371(f) (2); 21 U.S.C.A. § 346a(i) (4)]. Also the statute includes the usual standard of judicial review, namely, that the findings of the Secretary shall be conclusive if supported by substantial evidence. [21 U.S.C.A. § 371(f) (3); 21 U.S.C.A. § 346a(i) (2)].

Neither of these limitations on judicial review would apply in the District Court if the Lord-Mott ruling prevailed.

Federal Security Administrator v. Quaker Oats Co., 1943, 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724, is cited by the defendant but does not help its cause. That case was a review of the validity of a food standard but it arose under the *direct statutory appeal provisions*. [21 U.S.C.A. § 371(f)]. Unquestionably, the Court of Appeals and the Supreme Court could scrutinize the regulation challenged by Quaker Oats in such a proceeding, but even there the Supreme Court observed on page 227, 63 S.Ct. at page 594:

"The Act does not contemplate that courts should thus substitute their own judgment for that of the Administrator.

" * * * the Administrator's findings as to the facts if based on substantial evidence are conclusive."

In a collateral action to enforce the pesticide chemicals regulations, judicial inquiry into the validity of those regulations should embrace, at most, only questions that relate to notice and hearing.[3] As already shown, there was full compliance with these requirements.

2. *Danger To Health*

In recent years, Congress has enacted three important amendments to the Federal Food, Drug, and Cosmetic Act: (1) the Pesticide Chemicals Amendment [21 U.S.C.A. § 346a]; (2) the Food Additives Amendment [21 U.S.C.A. § 348]; and (3) the Color Additives Amendment [21 U.S.C.A. § 376]:

The underlying reason for these amendments is the growing concern of Congress [4] over the widespread use of

3. In recent years, Congress has streamlined the rule-making provisions of the Federal Food, Drug, and Cosmetic Act to dispense with hearings entirely and to permit regulations to become effective 30 days after publication unless a person, who will be adversely affected, files timely objections and requests a public hearing [21 U.S.C.A. § 371(e) (1) and (2); see also 21 U.S.C.A. § 346a(d) (5) and 21 U.S.C.A. § 348(f) (1)]. This procedure makes it unnecessary to conduct lengthy and expensive hearings to establish facts not in dispute. Where a hearing is held, it is confined to "receiving evidence relevant and material to the issues raised by such objections." [21 U.S.C.A. §§ 371(e) (3), 346a(d) (5), and 348(f) (1)].

4. Senate Report No. 1635, 1954 U.S.Code Congressional and Administrative News, p. 2626 ff; Senate Report No. 2422, 1958 U.S.Code Congressional and Administra-

chemicals and other additives in foods and drugs, and their subtle, insidious, cumulative, interacting, and long-range effect upon the health of the nation.

Each amendment follows essentially the same pattern. In an administrative proceeding, the proponent of the use of a particular chemical or other additive has the burden of establishing the safety of that item for a designated use. The Secretary of Health, Education, and Welfare then evaluates the safety of that item in accordance with legislative standards.[5]

If a useful pesticide chemical can be applied safely on fruits and vegetables, it is apparently a guiding principle of the Secretary to limit the permissible residue of that chemical to the amount necessary for the protection of those crops, even if a greater amount might be tolerated safely by humans.[6]

The Secretary was authorized to take into consideration "the margin of safety which the public interest required." See United States v. Detroit & Cleveland Navigation Co., 1945, 326 U.S. 236, 240, 66 S.Ct. 75, 90 L.Ed. 38. He was not required to set the tolerance at the maximum that the consumer (the old, the young, the weak, the strong, the sick and the well) might withstand "by indulging in hair-splitting speculation as to whether the amount of poison used may possibly have been so nicely calculated as not to kill or be of immediate serious injury." United States v. 1,950 Boxes of Macaroni, D.C.N.D.Ill.1910, 181 F. 427. As was observed in Atlas Powder Co. v. Ewing, 3 Cir., 1952, 201 F.2d 347, 355, "One making a rule for the future which in practical effect will determine whether millions of people shall eat something every day may reasonably refuse to subject the general public to even slight risks and small deceptions."

Such then were some of the considerations which resulted in the establishment of tolerances for pesticide chemical residues that presumably are well within safety limits. Once the Secretary's regulation became final, the chemicals to which it relates are deemed to be *unsafe* unless their use conforms to the terms of the regulation. [21 U.S.C.A. § 346a(a) (1)]. Questions dealing with safety and production needs must be presented to and determined by the Secretary. In a judicial proceeding to enforce the regulation, it is only necessary for the Government to prove a violation of the regulation, *not danger to health*. Otherwise this law could not be effectively enforced.

Flemming v. Florida Citrus Exchange, 1958, 358 U.S. 153, 79 S.Ct. 160, 3 L.Ed. 2d 188 (1958), concerned the validity of administrative regulations regarding the use of certain colors on foods. On page 162, 79 S.Ct. at page 166, the Court said:

"It is true that the ultimate purpose * * * of the adulteration

---

tive News, p. 5300 ff; Senate Report No. 795, 1960 U.S.Code Congressional and Administrative News, p. 2887 ff.

5. For example, in establishing a tolerance for pesticide chemicals, the Secretary is required to "give appropriate consideration, among other relevant factors, (1) to the necessity for the production of an adequate, wholesome, and economical food supply; (2) to the other ways in which the consumer may be affected by the same pesticide chemical or by other related substances that are poisonous or deleterious; and (3) to the opinion of the Secretary of Agriculture as submitted with a certification of usefulness * * *." [21 U.S.C.A. § 346a(b)].

6. Finding 23, Pesticide Chemical Regulations, 20 Federal Register 1473, 1493, reads as follows:

"Since many poisonous and deleterious substances are found in pesticide residues and the possible additive effect on the public health from all combinations of such substances is not known, and since the amounts of the separate poisonous and deleterious substances which experts believe may be tolerated by humans without hazard to man are at best only estimates, it will aid in the protection of the public health to limit the amount of such substances tolerated on fresh fruits and vegetables so that in no case is the amount tolerated greater than the maximum amount required for the protection of the fruits and vegetables against pests that may attack them."

provisions of the Act is to protect health, and that no one makes the color substances by themselves an item of diet. But it certainly was competent for Congress, in the light of what were recognized problems to health in the use of such added colors, to adopt a rule of caution in treating this recognized and definable problem area. *This rule of caution is here one which relieves the Secretary from the burden of showing in each case that a food containing them raises a possibility of injury to health,* and requires that the color stuffs, * * * not be added unless they could pass a higher standard." [Emphasis added.]

In the present case, the statutory design is clearly the same. The Government does not have the burden of showing that the DDT in this particular shipment of lettuce could be injurious to health. DDT may not be present in lettuce unless it meets a higher standard, namely, conformity to an administrative tolerance which has resulted from a broad and all-inclusive evaluation of DDT and other pesticide chemicals in foods.

■ In a long line of cases, the courts have held foods may be adulterated regardless of whether they are injurious to health, unless the particular statutory definition of adulteration expressly requires the Government to prove the possibility of injury to health. A. O. Andersen & Co. v. United States, 9 Cir., 1922, 284 F. 542, 544; United States v. Lexington Mill & Elevator Co., 1914, 232 U.S. 399, 410, 34 S.Ct. 337, 58 L.Ed 658; United States v. 716 Cases etc. Del Comida Brand Tomatoes, 10 Cir., 1950, 179 F.2d 174, 176; United States v. 449 Cases etc. Tomato Paste, 2 Cir., 1954, 212 F.2d 567, 570–572; and United States v. Lazere, D.C.N.D.Iowa 1944, 56 F.Supp. 730, 732.

The adulteration provision upon which this case was based says nothing of injury to health. [21 U.S.C.A. § 342(a) (2) (B)]. Compare with other food adulteration provisions which speak of "injurious to health." [21 U.S.C.A. § 342(a) (1); the second clause in 21 U.S.C.A. § 342(a) (4); and 21 U.S.C.A. § 342(a) (6)].

3. *The Exemption Proviso*

■ Defendant was charged with causing adulterated lettuce to be introduced and delivered for introduction into interstate commerce, in violation of 21 U.S.C.A. § 331(a). It was therefore the Government's burden to show that the lettuce was adulterated at the threshold of interstate commerce, Pasadena Research Laboratories, Inc., v. United States, 9 Cir., 1948, 169 F.2d 375, 380, cert. den. 335 U.S. 853, 69 S.Ct. 83, 93 L.Ed. 401, and this burden it fully met.

The Government's sample of lettuce, which upon analysis revealed the presence of excessive quantities of DDT, was obtained by food and drug inspectors from a conveyer belt that was carrying the lettuce into a freight car for shipment to another State. Defendant contended, however, that the Government's sampling was premature and that the defendant could be convicted only upon a showing that the lettuce contained excessive quantities of DDT after it reached the retail markets at destination. A more detailed statement of the facts is necessary to explain defendant's argument and the Court's ruling.

■ Defendant is a corporation engaged in the business of farming fruits and vegetables in Maricopa County, Arizona. It produces and ships substantial quantities of these products in interstate commerce.[7]

7. In fairness to the defendant, the Court notes that there is no showing here of repeated violations in disregard of prior warnings. In fact, the record indicates that a sample of another shipment of lettuce made by the defendant at about the same time was well within the tolerance for DDT. [Plaintiff's Exhibit 18]. However, it is settled that anyone who does business within the reach of the Federal Food, Drug, and Cosmetic Act is under an absolute obligation to comply

As the defendant receives orders for lettuce, it harvests enough lettuce to fill those orders. It then delivers that lettuce in cartons to a firm which, in a continuous operation, cools it and loads it promptly onto freight cars or trucks for out-of-state destinations. The delivery to the "cooling" firm is therefore a delivery for introduction into interstate commerce.

The shipment involved in this case consisted of 700 cartons of lettuce. It was delivered to a food broker in Wisconsin who was in the business of selling and distributing lettuce in smaller quantities to various wholesalers and distributors. Eventually, the lettuce would find its way into the retail market, a few cartons in one store, a few in another, etc. Defendant asserts that it is the practice of the retail markets to trim off some of the outer leaves of each head of lettuce before displaying it for sale and that such practice may bring the DDT content below the tolerance. Defendant contends that trimming of this type is a form of "processing" which brings the lettuce within the exemption proviso in 21 U.S.C.A. § 342(a)(2) and offers a complete defense unless (1) the Government obtains samples of the lettuce after it has been trimmed in the retail stores at destination, and (2) an analysis of *those* samples reveals the presence of more than 7 parts per million.

If this were a good defense, it is obvious that the law would be completely unenforceable. The general philosophy of this law is to nip the violation in the bud as close to the source as possible. See United States v. Walsh, 1947, 331 U.S. 432, 436, 67 S.Ct. 1283, 91 L.Ed. 1585. Evidence of allegedly "corrective" action which may be undertaken at destination has no bearing on the issue of whether the product was adulterated when introduced or delivered for introduction into interstate commerce. United States v. 52 Drums Maple Syrup, 2 Cir., 1940, 110 F.2d 914, 915.

The Court is convinced, however, that the exemption proviso does not help the defendant.[8] To see this proviso in proper perspective, it is well to bear in mind that it was enacted *in 1958* as a part of the *Food Additives Amendment*. [21 U.S.C.A. §§ 342(a)(2) and 348]. When Congress enacted the *Pesticide Chemicals Amendment in 1954,* it did not expressly include the exemption proviso but the legislative intent was clear from Senate Report No. 1635[9] which accompanied that amendment prior to enactment. In part, that Report stated[10]:

> "It (the bill) would also include those foods which have been subjected to certain customary postharvest treatment prior to marketing, such as the washing or coloring of fruits in their unpeeled natural form, *the*

with that law at all times. United States v. Dotterweich, 1943, 320 U.S. 277, 280–281, 284–285, 64 S.Ct. 134, 88 L.Ed. 48; Smith v. California, 1959, 361 U.S. 147, 152, 80 S.Ct. 215, 4 L.Ed.2d 205; Triangle Candy Co. v. United States, 9 Cir., 1944, 144 F.2d 195, 199, 155 A.L.R. 903. Enforcement actions such as this one serve the purpose of exerting pressure upon the defendant and others similarly situated to reappraise their procedures and adopt precautions that will prevent recurrence of the violation.

8. This proviso in 21 U.S.C.A. § 342(a)(2) reads: "Provided, That where a pesticide chemical has been used in or on a raw agricultural commodity in conformity with an exemption granted or a tolerance prescribed under section 346a of this title

and such raw agricultural commodity has been subjected to processing such as canning, cooking, freezing, dehydrating, or milling, the residue of such pesticide chemical remaining in or on such processed food shall, notwithstanding the provisions of sections 346 and 348 of this title, not be deemed unsafe if such residue in or on the raw agricultural commodity has been removed to the extent possible in good manufacturing practice and the concentration of such residue in the processed food when ready to eat is not greater than the tolerance prescribed for the raw agricultural commodity * * *."

9. 1954 U.S.Code Congressional and Administrative News, 2626.

10. Id. at page 2631.

*stripping of the outer leaves of lettuce,* and the preparation of fresh green salads. * * * Food processed by operations such as cooking, freezing, dehydration, or milling would remain subject to section 406 [21 U.S.C.A. § 346] rather than being regulated by this bill. [Now 21 U.S.C.A. § 346a]." [Emphasis added.]

While Congress in enacting this Amendment in 1954 did not include a statutory exemption proviso for processed foods, it clearly intended to exclude processed foods from the scope of that Amendment.[11] From the emphasized language it is plain Congress contemplated that the stripping of the outer leaves of lettuce *was not a processing* such as would make the lettuce a *processed food* and take it outside the bounds of the statute.

Nor was this Congressional design altered by the Food Additives Amendment in 1958. There, Congress tackled the problems of food additives *in processed foods* in depth. It drew a sharp line between the Food Additives Amendment and the Pesticide Chemicals Amendment. Thus in the definition of "food additive" it excluded pesticide chemicals in or on raw agricultural commodities.[12] The Congressional intent to leave the Pesticide Chemicals Amendment undisturbed is confirmed by the legislative history which also explains the purpose of the exemption proviso.[13]

The exemption proviso was written to deal with the special problem of processed foods made out of raw agricultural commodities that contain pesticide chemicals. Processed foods are subject to the requirements of Sections 346 and 348. Thus, if they contain any pesticide chemical residue derived from a raw agricul-

tural commodity, they violate those sections unless it is permitted by regulations issued under those sections. In a word, the exemption proviso makes such processed foods legitimate articles of commerce (if the conditions of exemption are met) without the need for special regulations under Section 346 or 348.

The exemption proviso appears to be a reasonable legislative accommodation of an industry practice. Thus apples are processed into applesauce. If the apples bear or contain no more than 7 parts per million of DDT, they do not violate the law. [21 CFR 120.101(e) (1)]. The applesauce, however, would also contain DDT and would violate Section 348 and possibly Section 346 unless a regulation under *those* sections authorized the presence of DDT in applesauce. By reason of the exemption proviso, a processed food like applesauce requires no regulation under Sections 346 or 348.

The exemption proviso simply saves an extra step. Because of this blanket exemption, industry does not have to seek, and the Secretary does not have to issue, a regulation for each such processed food. Obviously, if the apples are legitimate articles of commerce, then the applesauce made from those apples should not be rendered illegal because of the presence of a component permitted in or on the apples. Either by statutory exemption or by regulation, that applesauce must be considered a legal product. Congress chose the statutory exemption technique, *but* (to carry on the same illustration) *only for applesauce made from apples that contained no more than 7 parts per million of DDT.* The exemption does not apply to the apples themselves. They are never permitted to have more than 7 parts per million of DDT and the apple-

---

11. The Amendment deals only with raw agricultural commodities which by definition means food "in its raw or natural state." [21 U.S.C.A. § 321(r)].

12. 21 U.S.C.A. § 321(s).

13. Senate Report No. 2422, 1958 U.S. Code Congressional and Administrative News, p. 5300, at page 5304:

"Exempted from the scope of the legislation are (1) pesticide chemicals in or on raw agricultural commodities which are already covered by the pesticide chemicals amendment * * *; (2) residue of pesticide chemicals unavoidably remaining on processed foods not in excess of tolerances prescribed by Food and Drug Administration for raw agricultural commodities * * *."

sauce made from them must also stay within that limit.

According to the theory of the defense, the trimming of outer leaves of lettuce (which may or may not be done) is the type of processing contemplated by the exemption proviso. It is therefore immaterial how much DDT is on the lettuce when shipped. The proper test is how much remains on the lettuce after it is "processed" in the retail market. In response to questioning by the Court, defense counsel conceded that if his view were accepted the lettuce would not be adulterated when shipped even if it contained 1000 parts of DDT per million.

The Court seriously doubts that "trimmed" lettuce is a "processed" food. More significant, however, is the first condition of the exemption proviso [14] which contemplates that the raw agricultural commodity from which the processed food is made must itself conform to the pesticide chemicals tolerance. Overriding all else, of course, is the fact that the proviso exempts only the processed food and not the raw agricultural commodity.

It is an elementary rule "that exceptions from a general policy which a law embodies should be strictly construed, that is, should be so interpreted as not to destroy the remedial processes intended to be accomplished by the enactment." Spokane & Inland Empire Railroad Co. v. United States, 1916, 241 U.S. 344, 350, 36 S.Ct. 668, 60 L.Ed. 1037; McCauley v. Makah Indian Tribe, 9 Cir., 1942, 128 F.2d 867, 869–870. "One claiming the benefit of an exemption from a statute of general application has the burden of bringing himself clearly within it." Walling v. Reid, 8 Cir., 1943, 139 F.2d 323, 327.

The Court concludes as a matter of law that the defendant clearly does not come within the exemption proviso. In many cases, the courts have observed that the food and drug laws should be liberally construed more effectively to protect the public from adulterated and misbranded products. See United States v. El-O-Pathic Pharmacy, 9 Cir., 1951, 192 F.2d 62, 75. Perhaps the best short answer to the "exception proviso" defense appears in United States v. Dotterweich, 1943, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48. There too the defendant sought refuge under a strained interpretation of another exemption provision in the Federal Food, Drug, and Cosmetic Act. Rejecting the defense argument, the Supreme Court said at page 284, 64 S.Ct. at page 138:

"It * * * reads an exception to an important provision safeguarding the public welfare with a liberality which more appropriately belongs to enforcement of the central purpose of the Act."

### 4. Assessment of Costs

After the jury returned a verdict of guilty, it became the duty of the Court to impose a penalty. Since the defendant is a corporation, the Court could impose a maximum fine of $1,000. [21 U.S.C.A. § 333(a)]. Under all the circumstances and after a presentence investigation, it was the judgment of the Court that defendant pay a fine of $500.

In addition the Court ordered that defendant pay the costs of prosecution insofar as they are taxable. By stipulation of counsel, those costs amount to $2,000. Unquestionably, the total costs of investigation, analyses of samples, and trial preparation greatly exceed that sum.

The Court's authority is clear. 28 U.S.C. § 1918(b) reads: "Whenever any conviction for any offense not capital is obtained in a district court, the court may order that the defendant pay the costs of prosecution." It is settled that the taxing of costs in a criminal case is discretionary with the district court. United States v. Lee, 7 Cir., 1939, 107 F.2d 522, 527–528, cert. den. 309 U.S. 659, 60 S.Ct. 513, 84 L.Ed. 1008; Alberty v. United States, 9 Cir., 1937, 91 F.2d 461, 464.

Defendant was therefore ordered to pay the costs of prosecution.

14. See footnote 8, supra.